UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
J.P. MORGAN SECURITIES INC.,                          :

                        Plaintiff,                          : __Civil Action No.__(    )

        against-                          :

HERNAN E. ARBIZU,                          :

                    Defendant.                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## COMPLAINT

Plaintiff J.P. Morgan Securities Inc. ("JP Morgan" or "Plaintiff") alleges[1]:

### Jurisdiction and Venue

1.    The Court has jurisdiction in this action pursuant to 28 U.S.C. §1332(a) in that, as alleged below, plaintiff JP Morgan, on the one hand is a citizen of the States of Delaware and New York, and defendant Hernan E. Arbizu ("Arbizu" or "Defendant"), on the other hand, is a citizens of Argentina, a foreign state, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

2.    Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(a) because a substantial part of the events giving rise to Plaintiff's claims occurred in New York, New York and 28 U.S.C. §1391(d) because Defendant is an alien.

---

[1]    Submitted herewith in support of the Complaint is the Affidavit of Luke R. Palacio, sworn to June 13, 2008 (the "Palacio Aff.")

## The Parties

3.    JP Morgan is a corporation duly organized under the State of Delaware, with its principal place of business at 270 Park Avenue, New York 10017.   At all times relevant herein, JP Morgan is authorized to conduct, and has conducted business in the state of New York.

4.    JP Morgan is informed and believes, and on that basis alleges, that Arbizu is an individual who is and at all times mentioned herein lived in Connecticut and currently resides in Argentina.

5.    Arbizu was affiliated with JP Morgan in its Private Banking Department located at 270 Park Avenue, New York, New York 10017 until JP Morgan terminated him in May of 2008.

## Preliminary Statement

6.    JP Morgan brings this action for a temporary restraining order and a preliminary injunction to preserve the status quo pending arbitration between the parties.   Concurrent with the instant action, JP Morgan is filing a claim against Defendant with the Financial Industry Regulatory Authority ("FINRA")[2]

7.    This suit and the concurrent arbitration arise because Defendant has stolen property belonging to JP Morgan (and JP Morgan

---

[2]    In July 2007, the National Association of Securities Dealers, Inc. and the member regulation, enforcement and arbitration functions of the New York Stock Exchange, Inc. were consolidated to form the Financial Industry Regulatory Authority ("FINRA").   FINRA Dispute Resolution handles all arbitration proceedings.   For the sake of clarity, FINRA Dispute Resolution, Inc. and FINRA collectively are referred to herein as "FINRA."

clients), including but not limited to confidential and proprietary information, documents, materials, and assets, during his affiliation with JP Morgan and since has absconded with such property to Argentina.

8.     JP Morgan hired Arbizu in November of 2006. For the last year and a half, Arbizu served as Vice-President and Senior Private Banker for the Argentina and Chile region in JP Morgan's Private Banking Division in Manhattan, New York.  Prior to his termination, JP Morgan vested Arbizu with the responsibility for managing in excess of $200 million in assets for JP Morgan clients, for which JP Morgan paid him $300,000.  In his position at JP Morgan, Defendant was responsible for developing and maintaining relationships with high net worth individuals and their related businesses, corporations, institutions, trusts and other entities in Argentina and Chile.  As such, Defendant served as the principal contact between these clients and JP Morgan.  In performing his job, JP Morgan provided Defendant with access, on a daily basis, to very sensitive information concerning JP Morgan's clients.

9.     Beginning in May of 2008, JP Morgan discovered evidence that Defendant had effected unauthorized and illicit wire transfers between the account of a JP Morgan client and accounts at other firms, in addition (i) to purloining JP Morgan documents, materials, assets and/or information belonging to JP Morgan and to the clients Defendant served; and (ii) to stealing confidential and proprietary information and assets belonging

to JP Morgan and JP Morgan clients. In the meantime, Defendant has fled to Argentina. JP Morgan terminated him immediately thereafter.

10.    Defendant, as such, has breached the express terms of multiple contracts, restrictive covenants, and confidentiality agreements he signed with JP Morgan; has violated JP Morgan's Code of Conduct; and has contravened New York law, both statutory and common-law. Defendant's violations consist of, but are not limited to, breach of contract, the misappropriation of trade secrets and confidential information, breach of fiduciary duty and the duty of loyalty, and intentional and negligent interference with actual and prospective economic advantage, the misappropriation of trade secrets and confidential information, and conversion.

11.    To prevent irreparable harm arising from this course of wrongdoing, JP Morgan seeks immediate injunctive relief as follows: (i) barring Defendant from directly or indirectly using, disclosing, or transmitting for any purpose all JP Morgan documents, materials, assets, and/or information belonging to JP Morgan and/or JP Morgan clients that Defendant purloined; (ii) compelling Defendant to disgorge and to surrender all documents, materials, assets and/or information in whatever form (whether original, copied, computerized, electronic or handwritten) belonging to JP Morgan and JP Morgan's clients that Defendant purloined, stole, misappropriated, and/or with which he absconded; (iii) enjoining him from

4

destroying or converting any of these records, client information, documents, materials, assets and/or information in whatever form (whether original, copied, computerized, electronic or handwritten) belonging to JP Morgan and JP Morgan clients; (iv) compelling Defendant to return to JP Morgan all documents, materials, assets and/or information in whatever form (whether original, copied, computerized, electronic or handwritten) belonging to JP Morgan and JP Morgan clients; (v) ordering Defendant to purge any computerized materials and documents and information derived therefrom in his possession, custody or control after Defendant first prints and returns it to JP Morgan; and (vi) proscribing him from exploiting the records, client information, documents, materials, assets and/or information he stole to solicit JPMorgan clients for his benefit or to divert their accounts to a JP Morgan competitor.

### The Long-Term Investment Plan

12.    Defendant violated, and is violating, JP Morgan's 2005 Long-Term Incentive Plan ("The Incentive Plan"), containing confidentiality clauses and restrictive covenants, in addition to the JP Morgan Code of Conduct, and is guilty of additional misprision and malfeasance, the full extent of which we've yet to uncover.  He should be immediately enjoined from this misconduct.

13.    By accepting distributions of stock pursuant to the Incentive Plan on January 18, 2007 and January 22, 2008, Arbizu ratified

and accepted the terms of the Long-Term Incentive Plan ("The Incentive Plan"). A true and correct copy of The Incentive Plan is annexed to the Palacio Aff. as <u>Exhibit B</u>. In the Incentive Plan, Arbizu agreed to comply with JP Morgan's confidentiality policies during and after his employment with JP Morgan and further agreed not to solicit JP Morgan customers or to divert their account to JP Morgan competitors for a period of one year following termination of his employment. In addition, Arbizu consented to the issuance of an injunction if he breached his obligations under The Incentive Plan.

14.    Specifically, in The Incentive Plan, under the heading "Non-Solicitation of Employees and Customers" Arbizu agreed to treat as confidential all information about JP Morgan's Customers:

> During your employment by the Firm and for one year following the termination of your employment, or if longer, during all remaining vesting periods if you continue to vest after your employment with the Firm terminates, you will not directly or indirectly, whether on your own behalf or on behalf of any other party, without the prior written consent of the Director Human Resources of JPMorgan Chase: (i) solicit, induce or encourage any of the Firm's then current employees to leave the Firm or to apply for employment elsewhere; (ii) hire any employee or former employee who was employed by the Firm at the date your employment terminated, unless the individual's employment terminated more than six months before the date of hire or because his or her job was eliminated; or (iii) solicit or induce or attempt to induce to leave the Firm, or divert or attempt to divert from doing business with the Firm, any then current customers, suppliers or other persons or entities that were serviced by you or whose names became known to you by virtue of your employment with

the Firm, or otherwise interfere with the relationship between the Firm and such customers, suppliers or other persons or entities.

See Palacio Aff., Exhibit B at 3

15.    Furthermore, in The Incentive Plan, under the heading "Confidential Information," the Agreement specifies as follows:

You may not, either during your employment with the Firm or thereafter, directly or indirectly, use or disclose to anyone any confidential information related to the Firm's business, except as explicitly permitted by the JP Morgan Chase Code of Conduct and applicable policies or law or legal process.  "Confidential Information" shall have the same meaning for the Award Agreement as it has in the JP Morgan Chase Code of Conduct.

See Palacio Aff., Exhibit B at 4

16.    Lastly, through The Incentive Plan, under the heading "Damages," Arbizu also consented to injunctive relief for the violations he has committed.

You acknowledge that a violation or attempted violation of the obligations set forth herein will cause immediate and irreparable damage to the Firm, and therefore agree that the Firm shall be entitled as a matter of right to an injunction, from any court of competent jurisdiction, restraining any violation or further violation of such obligations; such right to an injunction, however, shall be cumulative and in addition to whatever other remedies the Firm may have under law or equity. In any action or proceeding by the Firm to enforce the terms and conditions of this Award Agreement where the Firm is the prevailing party, the Firm shall be entitled to recover from you its reasonable attorneys' fees and expenses incurred in such action or proceeding.

See Palacio Affidavit, Exhibit B, p. 4 (emphasis added)

**The JP Morgan Code of Conduct**

17.   In addition, Defendant also agreed to comply with JP Morgan's Code of Conduct ("the Code of Conduct").   A true and correct copy of the pertinent portions of the Code of Conduct is annexed to the Palacio Aff. as <u>Exhibit C</u>.   Through the Code of Conduct, Defendant acknowledged his obligation to maintain the confidentiality of all JP Morgan's proprietary and client information, but his malfeasance has abrogated this obligation.   Under the general heading "Confidential Information, Public Communication, Data Privacy," Stipulation 3.1, <u>Information about the firm, its customers, its employees, and others</u>, provides, in pertinent part:

> You may have access to confidential information related to the firm's business. Information related to the firm's business includes information about the firm, as well as information related to the firm's customers, counterparties, or advisory clients (all of which the Code refers to as customers), business partners, suppliers, and your fellow employees.
>
> You may not, either during your period of service or thereafter, directly or indirectly use or disclose to anyone any such confidential information, except as permitted by the Code and other policies applicable to you.
>
> (a) Assume that information that you have about the firm and its business, or about its past, present, or prospective customers, suppliers, and employees, is confidential, unless the contrary is clear;
> (b) Treat all personal information about individuals as confidential;
> (c) Before sharing confidential information with others in the firm, be sure that you are permitted to do so....

(d) Do not disclose confidential information to anyone outside the firm unless you are authorized to do so. Where such disclosure is authorized, a confidentiality or privacy agreement may be required; check with the Legal Department;

(g) Protect confidential information when communicating electronically - for instance, by e-mail or through the internet;

(h) [] All forms of communication are covered, including written, telephonic, and electronic communications such as website chatrooms, e-mail, and instant messaging.

See Palacio Affidavit, Exhibit C, p. 7

18.    The Code of Conduct defines confidential information as follows:

(a)    trade secrets, security and other business practices or processes, policies, procedures, or know-how internal and external audit reports

(b)    non-public portions of bank examination reports and other reports or information filed with regulators

(c)    software, data processing programs, databases

(d)    customer or supplier lists, telephone or other contact lists, and other information about customers

(e)    customer presentations

(f)    information about employees of customers or suppliers

(g)    cost, pricing, or financial information

(h)    employee directories, lists, telephone numbers, or other information about employees

(i)    employee compensation, health, or personnel records

(j)    business or marketing plans and research

(k)    information posted on the firm's internal websites

See Palacio Affidavit, Exhibit C, p. 28

19.    Arbizu also has violated The Code of Conduct's proscriptions relating to the use of JP Morgan assets.  Under general heading "Other Business Conduct,"  Assets of the Firm, Stipulation 5.1,  provides as

follows:

> You are expected to protect the firm's assets as well as the assets of others that come into your custody.
>
> The firm's assets include not only financial assets such as cash and securities and physical assets such as furnishings, equipment and supplies, but also customer relationships and intellectual property such as information about products, services, customers, systems and people. All property created, obtained, or compiled by or on behalf of the firm --- including customer lists, directories, files, reference materials and reports, computer software, data processing systems, computer programs, and databases --- belongs to the firm.
>
> The firm's assets should be used only for the conduct of the firm's business, except where limited incidental personal use is authorized by the Code or other applicable provision.

See Palacio Affidavit, Exhibit C, pp. 10-11

20.    Finally, Arbizu has violated The Code of Conduct's prescriptions concerning his post-employment responsibilities.  Under general heading "Other Business Conduct,"    Post-Employment Responsibilities, Stipulation 5.11, provides as follows:

> As a condition of continued employment with JPMorgan Chase, employees will have certain responsibilities after their employment with JPMorgan Chase terminates. These responsibilities include an obligation to return all fino assets in their possession, maintain the confidentiality of information, refrain from insider trading based on information obtained in the course of employment by JPMorgan Chase, and, if requested, assist JPMorgan Chase with investigations, litigation, and the protection of intellectual property relating to their employment. Senior-Level Employees have additional obligations for one year after they leave JPMorgan Chase, including prohibitions on the solicitation and hiring of

> JPMorgan Chase employees and solicitation of certain
> customers. Certain employees are subject to other post-
> employment restrictions. You are responsible for knowing
> which post-employment restrictions apply to you.

See Palacio Affidavit Exhibit C, pp.14-15

21.    When Defendant joined JP Morgan, he did not bring clients with him.  Instead, JP Morgan assigned to him and entrusted him with managing 13 accounts, with approximately $200 million assets.

22.    JP Morgan serves a highly-select segment of private clients and investors whose relationship with JP Morgan relationship Defendant's malfeasance has compromised.

23.    By virtue of Defendant's position at JP Morgan, Defendant had access to JP Morgan's confidential information related to the JP Morgan's clients that he was assigned to serve.  This information included names, addresses, telephone numbers, income sources and amounts, asset holdings, investment preferences, risk tolerances and financial goals.  This information was developed only through JP Morgan's substantial investment in on-going communications with these clients and the retention of that information over time.  By Firm policy and federal law, JP Morgan is obligated to always maintain that information as confidential and, absent prior express approval, not share it with any person outside of JP Morgan.

24.    While he was at JP Morgan, the Firm invested heavily in Defendant and the clients he was assigned to service.  JP Morgan has built

11

the loyalty of its customer base through many years of effort. JP Morgan spends substantial resources in terms of time, effort and money annually to provide programs and support to its registered representatives, including Defendant, for him to use to obtain and build relationships with its customers.

25. JP Morgan customer account material, records, and financial asset information are not available from other sources and have been created and updated for a period of years based on JP Morgan's relationship with its clients. JP Morgan has invested substantial corporate resources to develop and maintain its customer information. These resources include legal support, supplies, equipment, personnel and postage, personnel and equipment for solicitation and servicing, television advertising, print advertising, and other miscellaneous marketing activities.

26. JP Morgan has also expended significant resources to service the customers that were assigned to Defendant. These resources include execution costs for securities transactions, costs for staff and equipment to perform securities research and analysis, and other services. JP Morgan has borne the entire expense of these services and activities as well, with no financial contribution from Defendant.

27. The trade secret information that Defendant has misappropriated was entrusted to JP Morgan by its customers with the expectation that it would remain confidential and would not be disclosed to

12

third parties. Defendant had access to this information solely by virtue of his employment by JP Morgan. JP Morgan, and Defendant, are obliged to maintain the confidentiality of this information. For its part, JP Morgan took numerous steps to protect the confidentiality of this information. Defendant was fully aware of, and responsible for, complying with JP Morgan's internal policies regarding confidentiality. Moreover, every year JP Morgan conducts an annual compliance interview to ensure, among other things, that the confidentiality of JP Morgan's records is maintained. As a condition of his employment with JP Morgan, Defendant -- like all other JP Morgan registered representatives -- acknowledged that he was familiar with JP Morgan's internal policies regarding confidentiality of customer records. JP Morgan has implemented numerous other policies to ensure the confidentiality of its customer information. For example, access to the JP Morgan computer network by registered representatives is password-protected. Maintaining the confidences of its clients is critical to JP Morgan's business. Employees such as Defendant are instructed to maintain customer information as confidential. These instructions are confirmed in the agreements referenced above.

**Defendant's Wrongdoing**

28.    In May of 2008, JP Morgan discovered evidence that Defendant had effected unauthorized wire transfers between the account of a JP Morgan client and accounts at other firms, in addition (i) to

13

expropriating JP Morgan documents, materials, assets and/or information belonging to JP Morgan and to the clients Defendant served; and (ii) to purloining confidential and proprietary information and assets belonging to JP Morgan and JP Morgan clients.    Defendant then fled to Argentina.    JP Morgan terminated him immediately thereafter.    More recently, Defendant called the head of JP Morgan's Latin American Private Banking division, Alvaro Martinez-Fonts, and confessed to his wrongdoing and stated that he feared returning to the United States would result in his arrest.

29.    Since Defendant's termination, JP Morgan has commenced a preliminary investigation into the scope, range, and precise details of the confidential and proprietary documents, assets, and materials belonging to JP Morgan and JP Morgan's clients.    JP Morgan has yet to ascertain the full extent of Defendant's misprision but expects, once completed, a thorough investigation will reveal criminal conduct beyond the contractual, common-law, and statutory violations detailed in this affidavit.

30.    Before JP Morgan terminated him, Defendant contrived to transfer substantial sums of money out of one or more JP Morgan clients' accounts without those clients' knowledge or authority to unrelated accounts at other firms.    Upon information and belief, Defendant either forged or fabricated the authorization necessary to effect the wire transfers.

31.    Upon information and belief, Defendant also copied, downloaded and collected proprietary and confidential information, materials,

and assets belonging to JP Morgan and its clients: including, but not limited to, the names, addresses, social security numbers, telephone numbers and specific financial information pertaining to the JP Morgan clients whom the Defendant serviced. Defendant must return all of this purloined information to JP Morgan.

32.    JP Morgan management caused a search Defendant's office cubicle; none of the documents referenced above are there. Instead, it discovered copies of unauthorized wire instructions and fabricated account statements. Clearly, Defendant absconded with such documents when he fled to Argentina. In fact, JP Morgan management has been informed that counsel that it engaged in Buenos Aires was told by counsel for Arbizu on May 29, 2008 at a meeting held in Argentina that Arbizu possessed a list of all JP Morgan's Latin American clients.

33.    Unless Defendant's misconduct is immediately restrained and enjoined, other JP Morgan clients will suffer from Defendant's illegality and ability to exploit the confidential and proprietary assets and financial information he purloined, and other account executives of JP Morgan will be encouraged to engage in the same misconduct. Indeed, Defendant's malfeasance has disrupted JP Morgan's ability to conduct business in a stable manner and to maintain JP Morgan's goodwill with its customers and employees.

34.    Defendant's misconduct, as described above, constitutes

at a minimum, breach of contract, breach of fiduciary duty and duty of loyalty, misappropriation of trade secrets, tortious interference, conversion, and unfair competition.

35.    Defendant's wrongdoing has caused and will continue to cause irreparable harm to JP Morgan by causing:

(a)  Disclosure of JP Morgan's trade secrets and confidential and proprietary information, including customer lists and business information;

(b) Loss of confidentiality of customers' records and financial dealings, loss of customer confidence and trust, loss of goodwill, and loss of business reputation;

(c) Damage to office morale and stability, and the undermining of office protocols and procedures; and

(d) Present economic loss, which is unascertainable at this time, and future economic loss, which is incalculable.

36.    JP Morgan has made no prior application for this or similar relief.

37.    In the absence of a temporary restraining order and preliminary injunction, the relief sought in the arbitration being commenced will be rendered ineffectual.

## COUNT I
## (Breach of Contract)

38.    Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1 through 37 of this Complaint.

39.    By refusing to return to JP Morgan its confidential and proprietary business information and documents, and by misappropriating and misusing JP Morgan's confidential and proprietary business information and documents, Defendant has breached his contractual obligations to JP Morgan.  Further, Defendant has breached his contractual obligations to JP Morgan not to solicit clients he served at JP Morgan and not to ask them to terminate their relationships with JP Morgan.

40.    JP Morgan has performed all of its duties under all such contracts.

41.    JP Morgan has been injured and will continue to be injured by Defendant's breach of his contract in an amount which cannot readily be ascertained or compensated by money damages.

42.    Unless Defendant is enjoined from further breaches of his contractual duties, JP Morgan will suffer irreparable injury.

## COUNT II
## (Misappropriation of Trade Secrets and Confidential Information)

43.    Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1 through 42 of this Complaint.

44.    Information regarding JP Morgan's business and the other information described above, are trade secrets entitled to protection.

45.    JP Morgan's trade secrets and confidential information are known only to certain persons at JP Morgan, and are sufficiently secret and difficult to obtain that this information has economic value.

46.    JP Morgan's confidential and proprietary business information and documents are not known to JP Morgan's competitors.

47.    JP Morgan's confidential and proprietary business information and documents cannot be duplicated by any of JP Morgan's competitors without a significant expenditure of time, effort and expense.

48.    JP Morgan goes to great lengths and expense to maintain the confidentiality of its trade secrets and confidential information.

49.    Defendant has misappropriated JP Morgan's confidential and proprietary business information and documents which constitute protectable trade secrets and protectable confidential information.    Such misappropriation by Defendant is in direct breach of his contractual obligations to JP Morgan.

50.    Defendant's ongoing acts of misappropriation and use of JP Morgan's trade secrets and confidential information are transgressions of a continuing nature for which JP Morgan has no adequate remedy at law.

51.    Unless Defendant is enjoined from further acts of misappropriation and use of JP Morgan's trade secrets and confidential information, JP Morgan will suffer irreparable injury.

52.    By virtue of the foregoing improper conduct by Defendant, Plaintiff is, and continues to be, irreparably harmed.

### COUNT III
**(Conversion)**

53.    Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1 through 52 of this Petition.

54.    Plaintiff further alleges that Defendant's acts of conversion was done with a willful disregard of what he knew to be his legal duty and was performed with malice.

55.    By reason of the conduct alleged above, Defendant has converted JP Morgan's property.

56.    JP Morgan has been and will continue to be injured by Defendant's conduct.

### COUNT IV
**(Breach of Fiduciary Duty)**

57.    Plaintiff realleges and reincorporates herein by reference the allegations set forth in paragraphs 1 through 56 of this Petition.

58.    Defendant owed to JP Morgan a fiduciary duty of trust and loyalty.

59.    Defendant's fiduciary duties required him at all times to, among other things, act in JP Morgan's best interests and maintain the confidentiality of JP Morgan's trade secrets and other confidential and proprietary business and customer information. Defendant's fiduciary duties required him at all times to refrain from, among other things, soliciting JP Morgan's clients and JP Morgan's employees who worked for him to join Defendant at a competing company, or suggesting that they do so.

60.    Defendant has breached his fiduciary duties to JP Morgan by engaging in the conduct alleged above. Defendant engaged in such wrongdoing prior to the time he resigned from JP Morgan and after he joined JP Morgan's direct competitor, Morgan Stanley.

61.    As a direct and proximate result of Defendant's breach of fiduciary duty, JP Morgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated. Accordingly, JP Morgan is entitled to a temporary restraining order and a preliminary injunction.

### Count V
### (Intentional Interference with Actual
### and Prospective Economic Advantages)

62.    Plaintiff realleges and reincorporates herein by reference the allegations set forth in paragraphs 1 through 61 of this Petition.

63.    JP Morgan has developed and maintains advantageous actual and prospective business relationships with its clients that promise a continuing probability of future economic benefit to JP Morgan.

64.    JP Morgan is informed and believes, and on that basis alleges, that Defendant knew or reasonably should have known about JP Morgan's advantageous actual and prospective business relationships with its clients.

65.    JP Morgan is informed and believes, and on that basis alleges, that Defendant has intentionally, maliciously and improperly interfered with and continue to interfere with JP Morgan's relationships with its clients by, among other things, directly and/or indirectly attempting to induce JP Morgan clients to sever their relationships with JP Morgan and to induce them to do business with Morgan Stanley.

66.    There was no privilege and justification for Defendant's conduct. Moreover, Defendant's actions also constitute wrongful conduct above and beyond the act of interference itself, including misappropriation of trade secrets, breach of contract, and breach of Defendant's fiduciary duty.

67.    Defendant's conduct was willful and malicious.

68.    As a direct and proximate result of the Defendant's tortious interference with actual and prospective business relationships, JP Morgan has sustained and will continue to sustain irreparable injury, the

damages from which cannot now be calculated. Accordingly, JP Morgan is entitled to a temporary restraining order and a preliminary injunction.

WHEREFORE, Plaintiff JP Morgan respectfully requests that this Court:

A.    Grant JP Morgan a temporary restraining order and preliminary injunction in aid of arbitration enjoining and restraining Defendant, and all those acting in concert with him:

(i) from directly or indirectly using, disclosing, or transmitting for any purpose all JP Morgan documents, materials, assets, and/or information belonging to JP Morgan and/or JP Morgan clients that Defendant misappropriated;

(ii) to disgorge and to surrender all documents, materials, assets and/or information in whatever form (whether original, copied, computerized, electronic or handwritten) belonging to JP Morgan and JP Morgan's clients that Defendant misappropriated;

(iii) from destroying or converting any of these records, client information, documents, materials, assets and/or information in whatever form (whether original, copied, computerized, electronic or handwritten) belonging to JP Morgan and JP Morgan clients;

(iv) to return to JP Morgan all documents, materials, assets and/or information in whatever form (whether original, copied, computerized, electronic or handwritten) belonging to JP Morgan and JP Morgan clients;

(v) to purge any computerized materials and documents and information derived therefrom in his possession, custody or control after Defendant first prints and returns it to JP Morgan; and

(vi) from soliciting or inducing or attempting to induce to leave JP Morgan, or divert or attempt to divert from doing business with JP Morgan, any then current customers, suppliers or other persons or entities that were serviced by Defendant or whose names became known to Defendant by virtue of his

employment with JP Morgan, or otherwise interfere with the relationship between JP Morgan and such customers, suppliers or other persons or entities;

      B.    Grant JP Morgan leave to conduct expedited discovery in aid of this application, including examining Defendant under oath;

      C.    Grant JP Morgan its attorneys' fees and costs; and

      D.    Grant all other relief that this Court deems just.

Dated:   New York, New York
         June 13, 2008

                    PADUANO & WEINTRAUB LLP

                    By:_____
                        Anthony Paduano (AP 8400)
                        Jordan D. Becker (JB 3636)
                    1251 Avenue of the Americas
                    Ninth Floor
                    New York, New York 10020
                    (212) 785-9100

                    Attorneys for Plaintiff
                    J.P. Morgan Securities Inc.