UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
J.P. MORGAN SECURITIES INC.,                            :

                     Plaintiff,          : ___Civil Action No.____(      )

       against-                                          :

HERNAN E. ARBIZU,                                       :

                Defendant.          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## AFFIDAVIT OF LUKE R. PALACIO

STATE OF NEW YORK    :
                  : ss.:
COUNTY OF NEW YORK  :

      LUKE R. PALACIO, being duly sworn, deposes and says:

      1.    I am a Managing Director of JP Morgan Chase Bank, N.A.[1] in the Private Banking Division. I respectfully submit this Affidavit in support of JP Morgan's application for an order temporarily and preliminarily restraining and enjoining Hernan E. Arbizu (referred to herein as "Arbizu" or "Defendant") from (i) violating his confidentiality and non-solicitation agreements with JP Morgan, (ii) retaining the JP Morgan and JP Morgan's clients' confidential and proprietary information and assets he purloined and absconded with to Argentina; and (iii) ordering him to disgorge and to surrender all documents, materials, assets and/or information in whatever form that Defendant, misappropriated which belong to JP

---

[1] J.P. Morgan Securities Inc. and JPMorgan Chase Bank, N.A. are affiliates and are wholly owned by JP Morgan Chase & Co. They will be referred to herein as "JP Morgan").

Morgan and JP Morgan clients.  As a Managing Director of JPMorgan Chase Bank, N.A. in its New York office, I am fully familiar with the facts and circumstances set forth herein, based upon my personal knowledge and my review of Defendant's employment records.

2.    To prevent irreparable harm arising from this course of wrongdoing, JP Morgan seeks immediate injunctive relief as follows: (i) barring Defendant from directly or indirectly using, disclosing, or transmitting for any purpose all JP Morgan documents, materials, assets, and/or information belonging to JP Morgan and/or JP Morgan clients that Defendant misappropriated; (ii) compelling Defendant to disgorge and to surrender all documents, materials, assets and/or information in whatever form (whether original, copied, computerized, electronic or handwritten) belonging to JP Morgan and JP Morgan's clients that Defendant misappropriated; (iii) enjoining him from destroying or converting any of these records, client information, documents, materials, assets and/or information in whatever form (whether original, copied, computerized, electronic or handwritten) belonging to JP Morgan and JP Morgan clients; (iv) compelling Defendant to return to JP Morgan all documents, materials, assets and/or information in whatever form (whether original, copied, computerized, electronic or handwritten) belonging to JP Morgan and JP Morgan clients; (v) ordering Defendant to purge any computerized materials and documents and information derived therefrom in his possession, custody or control after Defendant first prints and

returns it to JP Morgan; and (vi) proscribing him from soliciting JP Morgan clients for his benefit or to divert their accounts to a JP Morgan competitor.

3.     JP Morgan is a member firm of the Financial Industry Regulatory Authority ("FINRA"), which was created in July 2007 through the consolidation of the National Association of Securities Dealers, Inc. (the "NASD") and the member regulation, enforcement and arbitration functions of the New York Stock Exchange. Defendant maintains securities licenses through FINRA.  In connection with his status as a Registered Representative of JP Morgan, Defendant executed a Form U-4 Uniform Application for Securities Industry Registration or Transfer.  By executing the Form U-4, Defendant agreed to submit to arbitration disputes, claims and controversies arising between himself and JP Morgan.  Pursuant to Rule 13804 of the NASD Code of Arbitration Procedure for Industry Disputes, if a party seeks temporary injunctive relief in connection with an arbitrable dispute, it must seek such relief from a court, not FINRA.  A true and correct copy of Rule 13804 is attached hereto as Exhibit A.

**Background Facts**

4.     JP Morgan hired Arbizu in November of 2006. For the last year and a half, Arbizu served as Vice-President and Senior Private Banker for the Argentina region in JP Morgan's Private Banking Division in New York City.  Prior to his termination, JP Morgan vested Arbizu with the responsibility for managing in excess of $200 million in assets for JP Morgan clients, for which JP Morgan paid

3

him $300,000.

5.    In his position at JP Morgan, Defendant was responsible for developing and maintaining relationships with high net worth individuals and their related businesses, corporations, institutions, trusts and other entities in Argentina. As such, Defendant served as the principal contact between these clients and JP Morgan.  In performing his job, Defendant was given access on a daily basis to very sensitive information concerning JP Morgan's clients.

6.    Beginning in May of 2008, JP Morgan discovered evidence that Defendant had effected unauthorized wire transfers between the account of a JP Morgan client and accounts at other firms, in addition (i) to purloining JP Morgan documents, materials, assets and/or information belonging to JP Morgan and to the clients Defendant served; and (ii) to stealing confidential and proprietary information and assets belonging to JP Morgan and JP Morgan clients.  JP Morgan terminated him immediately thereafter.  In the meantime, Defendant has fled to Argentina.

7.    Defendant, as such, has breached the express terms of multiple contracts, restrictive covenants, and confidentiality agreements he signed with JP Morgan; has violated JP Morgan's Code of Conduct; and has contravened New York law, both statutory and common-law.  Defendant's violations consist of, but are not limited to, breach of contract, the misappropriation of trade secrets and confidential information, breach of fiduciary duty and the duty of loyalty, and

intentional and negligent interference with actual and prospective economic advantage, the misappropriation of trade secrets and confidential information, and conversion.

### The Long-Term Investment Plan

8.    Defendant violated, and is violating, JP Morgan & Co.'s 2005 Long-Term Incentive Plan ("The Incentive Plan"), containing confidentiality clauses and restrictive covenants, in addition to the JP Morgan Code of Conduct, and is guilty of other misconduct.  He should be immediately enjoined from this behavior.

9.    By accepting distributions of stock pursuant to the Incentive Plan on January 18, 2007 and January 22, 2008, Arbizu ratified and accepted the terms of the Long-Term Incentive Plan.  A true and correct copy of The Incentive Plan is annexed hereto as <u>Exhibit B</u>.  In the Incentive Plan, Arbizu agreed to comply with JP Morgan's confidentiality policies during and after his employment with JP Morgan and further agreed not to solicit JP Morgan customers or to divert their account to JP Morgan competitors for a period of one year following termination of his employment.    In addition, Arbizu consented to the issuance of an injunction if he breached his obligations under The Incentive Plan.

10.    Specifically, in The Incentive Plan, under the heading "Non-Solicitation of Employees and Customers" Arbizu agreed to treat as confidential all information about JP Morgan's" Customers:

> During your employment by the Firm and for one year following the termination of your employment, or if longer, during all remaining vesting periods if you continue to vest after your

employment with the Firm terminates, you will not directly or indirectly, whether on your own behalf or on behalf of any other party, without the prior written consent of the Director Human Resources of JPMorgan Chase: (i) solicit, induce or encourage any of the Firm's then current employees to leave the Firm or to apply for employment elsewhere; (ii) hire any employee or former employee who was employed by the Firm at the date your employment terminated, unless the individual's employment terminated more than six months before the date of hire or because his or her job was eliminated; or (iii) solicit or induce or attempt to induce to leave the Firm, or divert or attempt to divert from doing business with the Firm, any then current customers, suppliers or other persons or entities that were serviced by you or whose names became known to you by virtue of your employment with the Firm, or otherwise interfere with the relationship between the Firm and such customers, suppliers or other persons or entities... <u>Exhibit B</u>, p. 3

11.     Further, The Incentive Plan, under the heading "Confidential Information," specifies as follows:

You may not, either during your employment with the Firm or thereafter, directly or indirectly, use or disclose to anyone any confidential information related to the Firm's business, except as explicitly permitted by the JP Morgan Chase Code of Conduct and applicable policies or law or legal process. "Confidential Information" shall have the same meaning for the Award Agreement as it has in the JP Morgan Chase Code of Conduct. <u>Exhibit B</u>, p. 4

12.     Through The Incentive Plan, under the heading "Damages," Arbizu also consented to injunctive relief for the violations he has committed.

<u>You acknowledge that a violation or attempted violation of the obligations set forth herein will cause immediate and irreparable damage to the Firm, and therefore agree that the Firm shall be entitled as a matter of right to an injunction, from any court of competent jurisdiction, restraining any violation or further violation of such obligations; such right to an injunction, however, shall be cumulative and in addition to whatever other remedies the Firm may have under law or equity. In any action</u>

6

or proceeding by the Firm to enforce the terms and conditions of this Award Agreement where the Firm is the prevailing party, the Firm shall be entitled to recover from you its reasonable attorneys' fees and expenses incurred in such action or proceeding.  Exhibit B, p. 4 (emphasis added)

### The JP Morgan Code of Conduct

13.    In addition, Defendant also agreed to comply with JP Morgan's

Code of Conduct ("the Code of Conduct").    A true and correct copy of the

pertinent portions of the Code of Conduct is annexed hereto as Exhibit C.  Through

the Code of Conduct, Defendant acknowledged his obligation to maintain the

confidentiality of all JP Morgan's proprietary and client information, but his

malfeasance has abrogated this obligation.  Under the general heading "Confidential

Information, Public Communication, Data Privacy," Stipulation 3.1, Information

about the firm, its customers, its employees, and others, provides, in pertinent part:

> You may have access to confidential information related to the firm's business. Information related to the firm's business includes information about the firm, as well as information related to the firm's customers, counterparties, or advisory clients (all of which the Code refers to as customers), business partners, suppliers, and your fellow employees.
>
> You may not, either during your period of service or thereafter, directly or indirectly use or disclose to anyone any such confidential information, except as permitted by the Code and other policies applicable to you.
>
> (a) Assume that information that you have about the firm and its business, or about its past, present, or prospective customers, suppliers, and employees, is confidential, unless the contrary is clear;
> (b) Treat all personal information about individuals as confidential;
> (c) Before sharing confidential information with others in the

7

firm, be sure that you are permitted to do so....

(d) Do not disclose confidential information to anyone outside the firm unless you are authorized to do so. Where such disclosure is authorized, a confidentiality or privacy agreement may be required; check with the Legal Department;

(g) Protect confidential information when communicating electronically - for instance, by e-mail or through the internet;

(h) [] All forms of communication are covered, including written, telephonic, and electronic communications such as website chatrooms, e-mail, and instant messaging. See Exhibit C, p. 7

14.    The Code of Conduct defines confidential information as follows:

(a) trade secrets, security and other business practices or processes, policies, procedures, or  know-how internal and external audit reports

(b)  non-public portions of bank examination reports and other reports or information filed with regulators

(c)  software, data processing programs, databases

(d) customer or supplier lists, telephone or other contact lists, and other information       about customers

(e) customer presentations

(f) information about employees of customers or suppliers

(g)  cost, pricing, or financial information

(h) employee directories, lists, telephone numbers, or other information about employees

(i)  employee compensation, health, or personnel records

(j)  business or marketing plans and research

(k) information posted on the firm's internal websites

Exhibit C, p. 28

15.    Arbizu also has violated The Code of Conduct's proscriptions relating to the use of JP Morgan assets.  Under general heading "Other Business Conduct," Assets of the Firm, Stipulation 5.1, provides as follows:

You are expected to protect the firm's assets as well as the assets of others that come into your custody.

The firm's assets include not only financial assets such as cash

8

and securities and physical assets such as furnishings, equipment and supplies, but also customer relationships and intellectual property such as information about products, services, customers, systems and people. All property created, obtained, or compiled by or on behalf of the firm --- including customer lists, directories, files, reference materials and reports, computer software, data processing systems, computer programs, and databases --- belongs to the firm.

The firm's assets should be used only for the conduct of the firm's business, except where limited incidental personal use is authorized by the Code or other applicable provision." See Exhibit C, pp. 10-11

16.     Finally, Arbizu has violated The Code of Conduct's prescriptions concerning his post-employment responsibilities.    Under general heading "Other Business Conduct," Post-Employment Responsibilities, Stipulation 5.11, provides as follows:

As a condition of continued employment with JPMorgan Chase, employees will have certain responsibilities after their employment with JPMorgan Chase terminates. These responsibilities include an obligation to return all firm assets in their possession, maintain the confidentiality of information, refrain from insider trading based on information obtained in the course of employment by JPMorgan Chase, and, if requested, assist JPMorgan Chase with investigations, litigation, and the protection of intellectual property relating to their employment. Senior-Level Employees have additional obligations for one year after they leave JPMorgan Chase, including prohibitions on the solicitation and hiring of JPMorgan Chase employees and solicitation of certain customers. Certain employees are subject to other post-employment restrictions. You are responsible for knowing which post-employment restrictions apply to you. Exhibit C, pp.14-15

17.    When Defendant joined JP Morgan, he did not bring clients with him.  Instead, JP Morgan assigned to him and entrusted him with managing 13

accounts, with approximately $200 million in assets.

18.    JP Morgan serves a highly-select segment of private clients and investors whose relationship with JP Morgan relationship Defendant's malfeasance has compromised.

19.    By virtue of Defendant's position at JP Morgan, Defendant had access to JP Morgan's confidential information related to the JP Morgan's clients that he was assigned to serve.    This information included names, addresses, telephone numbers, income sources and amounts, asset holdings, investment preferences, risk tolerances and financial goals.    This information was developed only through JP Morgan's substantial investment in on-going communications with these clients and the retention of that information over time.    By Firm policy and federal law, JP Morgan is obligated to always maintain that information as confidential and, absent prior express approval, not share it with any person outside of JP Morgan.

20.    While he was employed at JP Morgan, the Firm invested heavily in Defendant and the clients he was assigned to service.    JP Morgan has built the loyalty of its customer base through many years of effort.    JP Morgan spends substantial resources in terms of time, effort and money annually to provide programs and support to its registered representatives, including Defendant, for him to use to obtain and build relationships with its customers.

21.    JP Morgan customer account material, records, and financial

asset information are not available from other sources and have been created and updated for a period of years based on JP Morgan's relationship with its clients. JP Morgan has invested substantial corporate resources to develop and maintain its customer information. These resources include legal support, supplies, equipment, personnel and postage, personnel and equipment for solicitation and servicing, television advertising, print advertising, and other miscellaneous marketing activities.

22.    JP Morgan has also expended significant resources to service the customers that were assigned to Defendant. These resources include execution costs for securities transactions, costs for staff and equipment to perform securities research and analysis, and other services. JP Morgan has borne the entire expense of these services and activities as well, with no financial contribution from Defendant.

23.    The trade secret information that Defendant has misappropriated was entrusted to JP Morgan by its customers with the expectation that it would remain confidential and would not be disclosed to third parties. Defendant had access to this information solely by virtue of his employment by JP Morgan. JP Morgan and Defendant are obliged to maintain the confidentiality of this information. For its part, JP Morgan took numerous steps to protect the confidentiality of this information. Defendant was fully aware of, and responsible for, complying with JP Morgan's internal policies regarding confidentiality.

11

Moreover, every year JP Morgan conducts an annual compliance interview to ensure, among other things, that the confidentiality of JP Morgan's records is maintained. As a condition of his employment with JP Morgan, Defendant -- like all other JP Morgan registered representatives -- acknowledged that he was familiar with JP Morgan's internal policies regarding confidentiality of customer records. JP Morgan has implemented numerous other policies to ensure the confidentiality of its customer information. For example, access to the JP Morgan's computer network by registered representatives is password-protected. Maintaining the confidences of its clients is critical to JP Morgan's business. Employees such as Defendant are instructed to maintain customer information as confidential. These instructions are confirmed in the various agreements and policy manual provisions referenced above.

### Defendant's Wrongdoing

24.    In May of 2008, JP Morgan discovered evidence that Defendant had effected unauthorized wire transfers between a client of JP Morgan's and accounts at other firms, in addition (i) to expropriating JP Morgan documents, materials, assets and/or information belonging to JP Morgan and to the clients Defendant served; and (ii) to purloining confidential and proprietary information and assets belonging to JP Morgan and JP Morgan clients. Defendant then fled to Argentina. JP Morgan terminated him immediately thereafter. More recently, Defendant called the head of JP Morgan's Latin American Private Banking division,

Alvaro Martinez-Fonts, and confessed to his wrongdoing and that he feared returning to the United States would result in his arrest.

25.    Since Defendant's termination, JP Morgan has commenced a preliminary investigation into the scope, range, and precise details of the confidential and proprietary documents, assets, and materials belonging to JP Morgan and JP Morgan's clients.  JP Morgan has yet to ascertain the full extent of Defendant's misconduct but we expect, once completed, a thorough investigation will reveal criminal conduct beyond the contractual, common-law, and statutory violations detailed in this affidavit.

26.    Before JP Morgan terminated him, Defendant contrived to transfer substantial sums of money out of one or more JP Morgan clients' accounts without those clients' knowledge or authority to unrelated accounts at other firms. Upon information and belief, Defendant either forged or fabricated the authorization necessary to effect the wire transfers.

27.    Upon information and belief, Defendant also copied, downloaded and collected proprietary and confidential information, materials, and assets belonging to JP Morgan and its clients: including, but not limited to, the names, addresses, telephone numbers and specific financial information pertaining to the JP Morgan clients whom the Defendant serviced.  Defendant must return all of this purloined information to JP Morgan.

28.    I have asked my office staff to search Defendant's office

cubicle; none of the documents referenced above are there.    Instead, we discovered copies of unauthorized wire instructions and fabricated account statements. I only can conclude Defendant absconded with such documents when he fled to Argentina. In fact, I have been informed that counsel that JP Morgan engaged in Buenos Aires was told by counsel for Arbizu on May 29, 2008 at a meeting held in Argentina that Arbizu possessed a list of all JP Morgan's Latin American clients.

29.    Unless Defendant's misconduct is immediately restrained and enjoined, other JP Morgan clients will suffer from Defendants' illegality and ability to exploit the confidential and proprietary assets and financial information he purloined, and other account executives of JP Morgan will be encouraged to engage in the same misconduct.   Indeed, Defendant's malfeasance has disrupted JP Morgan's ability to conduct business in a stable manner and to maintain JP Morgan's goodwill with its customers and employees.

30.    Defendant's misconduct, as described above, constitutes at a minimum, breach of contract, breach of fiduciary duty and duty of loyalty, misappropriation of trade secrets, tortious interference, conversion, and unfair competition.

31.    Defendant's wrongdoing has caused and will continue to cause irreparable harm to JP Morgan by causing:

> (a) Disclosure of JP Morgan's trade secrets and confidential and proprietary information, including customer lists and business information;

14

(b) Loss of confidentiality of customers' records and financial dealings, loss of customer confidence and trust, loss of goodwill, and loss of business reputation;

(c) Damage to office morale and stability, and the undermining of office protocols and procedures; and

(d) Present economic loss, which is unascertainable at this time, and future economic loss, which is incalculable.

32.    JP Morgan has made no prior application for this or similar relief.

33.    Accordingly, JP Morgan respectfully requests that this Court maintain the status quo, and enjoin Defendant from continuing to violate his agreements until such time as an arbitration panel appointed by FINRA can address JP Morgan's claims for permanent injunctive relief against Defendant.

Luke R. Palacio

Sworn to before me this
13 th day of June, 2008

Notary Public

Terezinha Jakupovic
Notary Public State of New York
No. 01JA6031746 Qualified in Queens County
Certificate filed in New York County
Commission Expires Oct. 12, 2009

Location: <u>NASD</u> > <u>Manual</u> > <u>Rules of the Association</u> > <u>Procedural Rules (8000–14000)</u> > <u>13000. NASD Code of Arbitration Procedure for Industry Disputes</u> > <u>Part VIII Simplified Arbitration; Default Proceedings; Statutory Employment Discrimination Claims; and Injunctive Relief</u> > <u>13804. Temporary Injunctive Orders; Requests for Permanent Injunctive Relief</u>

<< **Previous**                                                                                                    **Next** >>

## 13804. Temporary Injunctive Orders; Requests for Permanent Injunctive Relief

**Notices**
(1 link)

**The Industry Code will apply to claims filed on or after April 16, 2007. In addition, the list selection provisions of the Industry Code will apply to previously filed claims in which a list of arbitrators must be generated after April 16, 2007; in these cases, however, the claim will continue to be governed by the remaining provisions of the old Code unless all parties agree to proceed under the new code.**

### (a) Temporary Injunctive Orders

(1) In industry or clearing disputes required to be submitted to arbitration under the Code, parties may seek a temporary injunctive order from a court of competent jurisdiction. Parties to a pending arbitration may seek a temporary injunctive order from a court of competent jurisdiction even if another party has already filed a claim arising from the same dispute in arbitration pursuant to this paragraph, provided that an arbitration hearing on a request for permanent injunctive relief pursuant to paragraph (b) of this rule has not yet begun.

(2) A party seeking a temporary injunctive order from a court with respect to an industry or clearing dispute required to be submitted to arbitration under the Code must, at the same time, file with the Director a statement of claim requesting permanent injunctive and all other relief with respect to the same dispute in the manner specified under the Code. The party seeking temporary injunctive relief must also serve the statement of claim requesting permanent injunctive and all other relief on all other parties in the same manner and at the same time as the statement of claim is filed with the Director.

(3) Filings and service under this rule must be made by facsimile, overnight delivery service or messenger. Service must be made on all parties at the same time and in the same manner, unless the parties agree otherwise. A party obtaining a court-issued temporary injunctive order must notify the Director and the other parties of the issuance of the order within one business day.

### (b) Hearing on Request for Permanent Injunctive Relief

(1) Scheduling of Hearing

If a court issues a temporary injunctive order, an arbitration hearing on the request for permanent injunctive relief will begin within 15 days of the date the court issues the temporary injunctive order. If the 15th day falls on a Saturday, Sunday, or NASD holiday, the 15-day period shall expire on the next business day. Unless the parties agree otherwise, a hearing lasting more than one day will be held on consecutive days when reasonably possible. The Director will provide to all parties notice of the date, time and place of the hearing at least three days prior to the beginning of the hearing.

(2) Composition of Arbitration Panel

The hearing on the request for permanent injunctive relief will be heard by a panel of three arbitrators. The composition of the panel will be determined in accordance with <u>Rule 13402</u>.

(3) Selection of Arbitrators and Chairperson

(A)(i) In cases in which all of the members of the panel are non-public, the Director will generate and provide to the parties a list of seven arbitrators from NASD's roster of non-public arbitrators. The Director will send to the parties the employment history for the past 10 years for each listed arbitrator and other background information. At least three of the arbitrators listed shall be lawyers with experience litigating cases involving injunctive relief.

(ii) Each party may exercise one strike to the arbitrators on the list. Within three days of receiving the list, each party shall inform the Director which arbitrator, if any, it wishes to strike, and shall rank the remaining arbitrators in order of preference. The Direct shall consolidate the parties' rankings, and shall appoint arbitrators based on the order of rankings on the consolidated list, subject to the arbitrators' availability and disqualification.

(B)(i) In cases in which the panel consists of a majority of public arbitrators, the Director will

generate and provide to the parties a list of nine arbitrators from NASD's roster of arbitrators. The Director shall send to the parties employment history for the past 10 years for each listed arbitrator and other background information. At least a majority of the arbitrators listed shall be public arbitrators, and at least four of the arbitrators listed shall be lawyers with experience litigating cases involving injunctive relief.

(ii) Each party may exercise two strikes to the arbitrators on the list. Within three days of receiving the list, each party shall inform the Director which arbitrators, if any, it wishes to strike, and shall rank the remaining arbitrators in order of preference. The Director will combine the parties' rankings, and will appoint arbitrators based on the order of rankings on the combined list, subject to the arbitrators' availability and disqualification.

(C)(i) Each party must inform the Director of its preference of chairperson of the panel by the close of business on the next business day after receiving notice of the panel members.

(ii) If the parties do not agree on a chairperson within that time, the Director shall select the chairperson. In cases in which the panel consists of a majority of public arbitrators, the Director will select a public arbitrator as chairperson. Whenever possible, the Director will select as chairperson the lawyer with experience litigating cases involving injunctive relief whom the parties have ranked the highest.

(D) The Director may exercise discretionary authority and make any decision that is consistent with the purposes of this rule and the Code to facilitate the appointment of panels and the selection of chairperson.

(4) Applicable Legal Standard

The legal standard for granting or denying a request for permanent injunctive relief is that of the state where the events upon which the request is based occurred, or as specified in an enforceable choice of law agreement between the parties.

(5) Effect of Pending Temporary Injunctive Order

Upon a full and fair presentation of the evidence from all relevant parties on the request for permanent injunctive relief, the panel may prohibit the parties from seeking an extension of any court-issued temporary injunctive order remaining in effect, or, if appropriate, order the parties jointly to move to modify or dissolve any such order. In the event that a panel's order conflicts with a pending court order, the panel's order will become effective upon expiration of the pending court order.

(6) Fees, Costs and Expenses, and Arbitrator Honorarium

(A) The parties shall jointly bear reasonable travel-related costs and expenses incurred by arbitrators who are required to travel to a hearing location other than their primary hearing location(s) in order to participate in the hearing on the request for permanent injunctive relief. The panel may reallocate such costs and expenses among the parties in the award.

(B) Each party seeking a temporary injunctive order in court pursuant to this rule must pay a non-refundable surcharge of $2,500 at the time the party files its statement of claim and request for permanent injunctive relief. In the award, the panel may decide that one or more parties must reimburse a party for part or all of the surcharge. The surcharge is in addition to all other non-refundable filing fees or costs that are required under the Code.

(C) Notwithstanding any other provision in the Code, the chairperson of the panel hearing a request for permanent injunctive relief pursuant to this rule shall receive an honorarium of $375 for each single session, and $700 for each double session, of the hearing. Each other member of the panel shall receive an honorarium of $300 for each single session, and $600 for each double session, of the hearing. The parties shall equally pay the difference between these amounts and the amounts panel members and the chairperson receive under the Code pursuant to Rule 13214. The panel may reallocate such amount among the parties in the award.

### (c) Hearing on Damages or Other Relief

(1) Upon completion of the hearing on the request for permanent relief, the panel may, if necessary, set a date for any subsequent hearing on damages or other relief, which shall be held before the same panel and which shall include, but not be limited to, the same record.

(2) The parties shall jointly bear reasonable travel-related costs and expenses incurred by arbitrators who are required to travel to a hearing location other than their primary hearing location(s) in order to participate in any subsequent hearings on damages or other relief. The panel may reallocate such costs and expenses among the

parties in the award.

Adopted by SR-NASD-2004-011 eff. April 16, 2007.

**Selected Notice:** 07-07

**‹‹ Previous**                                                                 **Next ››**

©2008 FINRA. All rights reserved.

6/15/2008 7:34 PM

# JPMORGAN CHASE & CO. 2005 LONG-TERM INCENTIVE PLAN

## TERMS AND CONDITIONS OF JANUARY 22, 2008
## RESTRICTED STOCK UNIT AWARD

**Award Agreement**

These terms and conditions are made part of the Award Agreement dated as of January 22, 2008 ("Grant Date") awarding restricted stock units pursuant to the terms of the JPMorgan Chase & Co. 2005 Long-Term Incentive Plan ("Plan"). To the extent the terms of the Award Agreement (all references to which will include these terms and conditions) conflict with the Plan, the Plan will govern.

The Award Agreement, the Plan and Prospectus supersede any other agreement, whether written or oral, that may have been entered into by the Firm and you relating to this award.

The grant of this award is contingent upon your acceptance of this Award Agreement. **Unless you decline by the deadline and in the manner specified in the Award Agreement, you will have accepted this award and be bound by these terms and conditions, effective as of the Grant Date.** If you decline the award, it will not become effective and will be cancelled as of the Grant Date.

Capitalized terms that are not defined in the Award Agreement will have the same meaning as set forth in the Plan.

JPMorgan Chase & Co. will be referred to throughout the Award Agreement as "JPMorgan Chase," and together with its subsidiaries as the "Firm."

**Form and Purpose of Award**

Each restricted stock unit represents a non-transferable right to receive one share of Common Stock following the applicable vesting date.

The purpose of this award is to motivate your future performance and to align your interests with those of the Firm and its shareholders.

**Dividend Equivalents**

If dividends are paid on Common Stock while restricted stock units under this award are outstanding, you will be paid an amount equal to the dividend paid on one share of Common Stock, multiplied by the number of restricted stock units outstanding to you.

**Vesting Dates/ Vesting Periods**

This award will vest according to the schedule on your Award Agreement, provided that you are continuously employed by the Firm, or you meet the requirements for continued vesting described below, through the relevant vesting date. The period from the Grant Date to each vesting date will be a separate "vesting period."

**Termination of Employment**

Except as explicitly set forth below under "Job Elimination" "Full Career Eligibility," "Total Disability," and "Death," any restricted stock units outstanding under this award will be cancelled effective on the date your employment with the Firm terminates for any reason.

**Job Elimination, Full Career Eligibility, Total Disability**

Subject to your compliance with the terms and conditions of this Award Agreement, you will be eligible to continue to vest in your outstanding restricted stock units following the termination of your employment if one of the following circumstances applies to you.

Job Elimination:
Your award will continue to vest on the original schedule following termination of employment in the event that:

- the Director Human Resources of the Firm or his nominee in his sole discretion determines that the Firm terminated your employment because your job was eliminated, <u>and</u>
- after you are notified that your job will be eliminated, you provide such services as requested by the Firm in a cooperative and professional manner.

Full Career Eligibility:
Your award will continue to vest on the original schedule following termination of employment in the event that:

- you leave the Firm voluntarily, have completed at least five years of continuous service with the Firm immediately preceding your termination date, and: (a) the sum of your age and Recognized Service (as defined below) on your date of termination equals or exceeds 60, and
- you provide at least 90 days advance written notice to the Firm of your intention to voluntarily terminate your employment under this provision during which notice period you provide such services as requested by the Firm in a cooperative and professional manner and you do not perform any services for any other employer, <u>and</u> for the remainder of the relevant vesting period, you do not (i) perform services in any capacity (including self-employment) for a Financial Services Company  or (ii) work in your profession (whether or not for a non-Financial Services Company); provided that you may work for a government, education or Not-for-Profit Organization (as defined below).

After receipt of such advance written notice, the Firm may choose to have you continue to provide services during such 90-day period, or may place you on a paid leave for all or a part of the 90-day period.  You and the Firm may mutually agree to shorten the length of the 90-day notice period, but to a date no earlier than the date you would otherwise meet the age and service requirement.

Additional advance notice requirements may apply in certain business units (or equivalent organizational unit or department).  (<u>See "Special Notice Period" below.</u>)

Total Disability:
In the event your employment terminates as a result of your permanent and total disability as defined in the JPMorgan Chase & Co. Long Term Disability Plan (or for non-U.S. employees the equivalent local country plan), your outstanding units will continue to vest on the original schedule during such period of disability provided that you remain unemployed for such period.

For both Full Career Eligibility and Total Disability, you must notify JPMorgan Chase in writing if you perform services for any party or if you are self-employed during the vesting periods.

**Release/ Certification**

In order to qualify for continued vesting after termination of your employment under any of the foregoing circumstances:

- you must timely execute and deliver a release of claims in favor of the Firm, having such form and terms as the Firm shall specify,
- with respect to Full Career Eligibility, prior to the termination of your employment, you must confirm with management that you meet the eligibility criteria (including providing at least 90 days advance written notification) and advise that you are seeking to be treated as an individual eligible for Full Career Eligibility, and
- other than in the case of a job elimination, it is your responsibility to take the appropriate steps to certify to the Firm prior to each vesting date on the authorized form of the Firm that you have complied with the employment restrictions applicable to you (as described above) throughout the vesting period and otherwise complied with all other terms of the Award Agreement.   (See "Your Obligations.")

**Death**

If you die while you are eligible to vest in your outstanding units, the units will immediately vest and will be distributed in shares of Common Stock (after applicable tax withholding) to your designated beneficiary on file with the Firm's Stock Administration Department, or if no beneficiary has been designated or survives you, then to your estate.  Any shares will be distributed by the later of the end of the calendar year in which you die or the 15th day of the third month following your date of death.

**Termination for Cause**

In the event that your employment is terminated for Cause (as defined below), or in the event that JPMC determines after the termination of your employment that your employment should have been terminated for Cause, your outstanding restricted stock units as of your termination date shall be forfeited and you may be required to return to the Firm the value of certain shares previously delivered to you.   See "Remedies" for additional information.

**Your Obligations**

As consideration for the grant of this award, you agree to comply with and be bound by the following:

- **Non-Solicitation of Employees and Customers**

During your employment by the Firm and for one year following the termination of your employment, or if longer, during all remaining vesting periods if you continue to vest after your employment with the Firm terminates, you will not directly or indirectly, whether on your own behalf or on behalf of any other party, without the prior written consent of the Director Human Resources of JPMorgan Chase: (i) solicit, induce or encourage any of the Firm's then current employees to leave the Firm or to apply for employment elsewhere; (ii) hire any employee or former employee who was employed by the Firm at the date your employment terminated, unless the individual's employment terminated more than six months before the date of hire or because his or her job was eliminated; or (iii) solicit or induce or attempt to induce to leave the Firm, or divert or attempt to divert from doing business with the Firm, any then current customers, suppliers or other persons or entities that were serviced by you or whose names became known to you by virtue of your employment with the Firm, or otherwise interfere with the relationship between the Firm and such customers, suppliers or other persons or entities.   This

3

does not apply to publicly known institutional customers that you service after your employment with the Firm without the use of the Firm's confidential or proprietary information.

These restrictions do not apply to authorized actions you take in the normal course of your employment with the Firm, such as employment decisions with respect to employees you supervise or business referrals in accordance with the Firm's policies.

- **Confidential Information:**

You may not, either during your employment with the Firm or thereafter, directly or indirectly use or disclose to anyone any confidential information related to the Firm's business, except as explicitly permitted by the JPMorgan Chase Code of Conduct and applicable policies or law or legal process. "Confidential information" shall have the same meaning for the Award Agreement as it has in the JPMorgan Chase Code of Conduct.

- **Non-Disparagement:**

You may not, either during your employment with the Firm or thereafter, make or encourage others to make any public statement or release any information that is intended to, or reasonably could be foreseen to, embarrass or criticize the Firm or its employees, directors or shareholders as a group. This shall not preclude you from reporting to the Firm's management or directors or to the government or a regulator conduct you believe to be in violation of the law or the Firm's Code of Conduct or responding truthfully to questions or requests for information to the government, a regulator or in a court of law in connection with a legal or regulatory investigation or proceeding.

- **Compliance with Award Agreement:**

You agree that you will provide the Firm with any information reasonably requested to determine compliance with the Award Agreement, and you authorize the Firm to disclose the terms of the Award Agreement to any third party who might be affected thereby, including your prospective employer.

- **Special Notice Period:**

If you are a managing director, executive director or vice president (or comparable title) of a business unit or equivalent organizational unit or department ("business unit") that requires as a condition of your continued employment that you provide advance written notice ("Special Notice Period") of your intention to terminate your employment for any reason, then as consideration for this Award, you shall provide the Firm advance written notice of your election to terminate your employment as specified by such business unit. In business units that require this Special Notice Period, the current notice period is 90 days for managing directors (or comparable title), 60 days for executive directors (or comparable title) and 30 days for vice presidents (or comparable title). Please note that in some cases, individuals may have specific agreements providing for longer notice periods than those stated above. In those cases, the longer notice period shall apply.

After receipt of such notice, the Firm may choose to have you continue to provide services during the applicable Special Notice Period or may place you on a paid leave for all or part of the applicable Special Notice Period. During the Special Notice Period, you shall continue to devote your full time and loyalty to the Firm by providing services in a cooperative and professional manner and not perform any services for any other employer and shall receive your base salary and certain benefits until your

employment terminates.

You and the Firm may mutually agree to waive or modify the length of the Special Notice Period. Notwithstanding the foregoing, regardless of your title, you must comply with the 90-day advance notice period in the event you wish to terminate employment under the Full Career Eligibility provision.

**Remedies**
- **Cancellation**

In addition to the provisions described under "Termination of Employment" and "Termination for Cause", your outstanding restricted stock units will be cancelled if:
- the Firm in its sole discretion determines that you are not in compliance with any of the advance notice/cooperation requirements and/or employment restrictions applicable to your termination of employment, or
- you fail to return the required forms specified under "Release/Certification" within the specified deadline, including the certification required immediately prior to a vesting date under Full Career Eligibility and Total Disability, or
- you violate any of the provisions as set forth above in "Your Obligations."

- **Damages**

In addition, you will be required to pay the Firm as liquidated damages an amount equal to the Fair Market Value (determined as of the vesting date) of the net number of shares of Common Stock distributed to you under this award as follows:

- shares distributed within the one year period prior to your violation of any of the provisions as set forth above in "Your Obligations;"
- shares distributed at any time following termination of employment when you were not in compliance with the employment restrictions then applicable to you during the vesting period, and
- shares distributed within the one year period immediately preceding your termination for Cause (as described under "Termination for Cause").

Payment may be made in shares of Common Stock or in cash. You agree that this payment will be liquidated damages and is not to be construed in any manner as a penalty. You acknowledge that a violation or attempted violation of the obligations set forth herein will cause immediate and irreparable damage to the Firm, and therefore agree that the Firm shall be entitled as a matter of right to an injunction, from any court of competent jurisdiction, restraining any violation or further violation of such obligations; such right to an injunction, however, shall be cumulative and in addition to whatever other remedies the Firm may have under law or equity. In any action or proceeding by the Firm to enforce the terms and conditions of this Award Agreement where the Firm is the prevailing party, the Firm shall be entitled to recover from you its reasonable attorneys' fees and expenses incurred in such action or proceeding.

**Withholding Taxes**

The Firm will retain from each distribution the number of shares of Common Stock required to satisfy applicable tax obligations (including, to the extent legally permissible, recovery by the Firm of fringe benefit

taxes).  For U.S. tax purposes, dividend equivalents are treated as wages and subject to tax withholding when paid.  If, according to local country tax regulations, a withholding tax liability arises at a time after the date of vesting, JPMorgan Chase may implement any procedures necessary to ensure that the withholding obligation is fully satisfied, including but not limited to, restricting transferability of the shares.

**Administrative Provisions**

**No Ownership Rights**: Restricted stock units do not convey the rights of ownership of Common Stock and do not carry voting rights.  No shares of Common Stock will be issued to you until after the restricted stock units have vested and all applicable restrictions have lapsed.  Shares will be issued in accordance with JPMorgan Chase's procedures for issuing stock. JPMorgan Chase's obligation hereunder is unfunded.

**Binding Agreement**:  The Award Agreement will be binding upon any successor in interest to JPMorgan Chase, by merger or otherwise.

**Not a Contract of Employment**: Nothing contained in the Award Agreement constitutes a contract of employment or continued employment.  Employment is at-will and may be terminated by either you or JPMorgan Chase for any reason at any time.   This award does not confer any right or entitlement to, nor does the award impose any obligation on the Firm to provide, the same or any similar award in the future.

**Section 409A Compliance**; Notwithstanding anything herein to the contrary, if you (i) are subject or become subject  to taxation under the United States Internal Revenue Code ("Code"), (ii) are a specified employee as defined in the JPMorgan Chase 2005 Deferred Compensation Plan  and  (iii) incur a  separation from service and if this award in whole or part represents deferred compensation as defined in Section 409A of the Code and if shares under the award  are distributable to you as a result your separation from service, then those shares will be delivered to you on first business day of the first calendar month after the expiration of six full months from date of your separation from service (or if later, the vesting date).   Further, if any award in whole or part is deferred compensation within the meaning of Section 409A of the Code to which the short-term deferral rule does not apply, then a vesting date shall be a payment date.

**Change in Outstanding Shares**:  In the event of any change in the outstanding shares of Common Stock by reason of any stock dividend or split, recapitalization, issuance of a new class of common stock, merger, consolidation, spin-off, combination or exchange of shares or other similar corporate change, or any distributions to stockholders of Common Stock other than regular cash dividends, the Committee will make an equitable substitution or proportionate adjustment, in the number or kind of shares of Common Stock or other securities issued or reserved for issuance pursuant to the Plan and to any Restricted Stock Units outstanding under this award for such corporate events.

**Interpretation/Administration**: The Director Human Resources has sole and complete authority to interpret and administer this Award Agreement, including, without limitation, the power to (i) interpret the Plan and the terms of this Award Agreement; (ii) determine the reason for

termination of employment and application of the post-employment obligations; (iii) decide all claims arising with respect to this Award; and (iv) delegate such authority as he deems appropriate. Any determination by the Director Human Resources shall be binding on all parties.

Notwithstanding anything herein to the contrary, the Firm's determinations under the Plan and the Award Agreements are not required to be uniform. By way of clarification, the Firm shall be entitled to make non-uniform and selective determinations and modifications under Award Agreements and the Plan.

**Amendment**: The Firm by action of its Director Human Resources reserves the right to amend this Award Agreement at any time and for any reason before a change in control of JPMorgan Chase, as such term is defined by the Board from time to time. After a change in control of JPMorgan Chase, this Award Agreement may not be amended in any way that is adverse to your interests without your prior written consent. This Award Agreement may not be amended except in writing signed by the Director Human Resources of JPMorgan Chase.

**Severability**: If any portion of the Award Agreement is determined by the Firm to be unenforceable in any jurisdiction, any court of competent jurisdiction or the Director Human Resources may reform the relevant provisions (e.g., as to length of service, time, geographical area or scope) to the extent the Firm considers necessary to make the provision enforceable under applicable law.

**Governing Law**: By accepting this award, you are agreeing (i) to the extent not preempted by federal law, the laws of the state of New York (without reference to conflict of law principles) will apply to the award and the Plan and (ii) to waive the right to a jury trial with respect to any judicial proceeding brought in connection with this award.

**Definitions**

"Cause" means a determination by the Firm that your employment terminated as a result of your (i) violation of any law, rule or regulation (including rules of self-regulatory bodies) related to the Firm's business; (ii) indictment or conviction of a felony; (iii) commission of a fraudulent act; (iv) violation of the JPMorgan Code of Conduct or other Firm policies or misconduct related to your duties to the Firm (other than immaterial and inadvertent violations or misconduct); (v) failure to perform satisfactorily the duties associated with your job function or to follow reasonable directives of your manager; or (vi) any act or failure to act that is or might reasonably be expected to be injurious to the interests of the Firm or its relationship with a customer, client or employee.

"Financial Services Company" means a business enterprise that employs you in any capacity (as an employee, contractor, consultant, advisor, self-employed individual, etc. whether paid or unpaid) and engages in:

- commercial or retail banking, including, but not limited to, commercial, institutional and personal trust, custody and/or lending and processing services, originating and servicing mortgages, issuing and servicing credit cards;

- insurance, including but not limited to, guaranteeing against loss, harm damage, illness, disability or death, providing and issuing

annuities, acting as principal, agent or broker for purpose of the forgoing;

- financial, investment or economic advisory services, including but not limited to, investment banking services (such as advising on mergers or dispositions, underwriting, dealing in, or making a market in securities or other similar activities), brokerage services, investment management services, asset management services, and hedge funds;

- issuing, trading or selling instruments representing interests in pools of assets or in derivatives instruments;

- advising on, or investing in, private equity or real estate, or

- any similar activities that JPMorgan Chase determines in its sole discretion constitute financial services.

"Not-for-Profit Organization" means an entity exempt from tax under state law and under Section 501(c)(3) of the Internal Revenue Code. Section 501(c)(3) includes entities organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary or educational purposes, or to foster national or international amateur sports competition or for the prevention of cruelty to children or animals.

"Recognized Service" means the period of service as an employee set forth in the Firm's applicable service-related policies.

**FEBRUARY 2008**

# CODE OF CONDUCT

**JPMorganChase** ⬮

# INTRODUCTION

Our integrity and reputation depend on our ability to do the right thing, even when it's not the easy thing. The Code of Conduct is a collection of rules and policy statements intended to assist employees and directors in making decisions about their conduct in relation to the firm's business. The Code is based on our fundamental understanding that no one at JPMorgan Chase should ever sacrifice integrity -- or give the impression that they have -- even if they think it would help the firm's business.

Each of us is accountable for our actions, and each of us is responsible for knowing and abiding by the policies that apply to us. Managers have a special responsibility, through example and communication, to ensure that employees under their supervision understand and comply with the Code and other relevant policies.

You can look to the Code of Conduct to guide your decisions in a variety of circumstances. However, no rulebook can anticipate every situation. Ultimately, the personal integrity and honesty of every JPMorgan Chase employee define the character of our company. Never underestimate the importance of your own ethical conduct to the business and success of JPMorgan Chase.

### 3.    CONFIDENTIAL INFORMATION, PUBLIC COMMUNICATION, DATA PRIVACY

We are all responsible for the safeguarding of confidential information, whether it is information entrusted to us by our customers, information regarding JPMorgan Chase's businesses and activities, or information about other employees.

#### 3.1.    Information about the firm, its customers, its employees, and others

You may have access to confidential information related to the firm's business. Information related to the firm's business includes information about the firm, as well as information related to the firm's customers, counterparties, or advisory clients (all of which the Code refers to as customers), business partners, suppliers, and your fellow employees.

You may not, either during your period of service or thereafter, directly or indirectly use or disclose to anyone any such confidential information, except as permitted by the Code and other policies applicable to you.

You should observe the following principles when dealing with information relating to the firm's business:

(a)    Assume that information that you have about the firm and its business, or about its past, present, or prospective customers, suppliers, and employees, is confidential, unless the contrary is clear.

(b)    Treat all personal information about individuals as confidential.

(c)    Before sharing confidential information with others in the firm, be sure that you are permitted to do so.  Do not disclose confidential customer information to other employees who are not involved with the transaction or service for which the information was provided to the firm --- even if you believe the disclosure might be useful in the context of other firm business --- unless you are authorized to do so.

(d)    Do not disclose confidential information to anyone outside the firm unless you are authorized to do so.  Where such disclosure is authorized, a confidentiality or privacy agreement may be required; check with the Legal Department.

(e)    If you are permitted to share confidential information, use your judgment to limit the amount of information shared and disclose it only on a need-to-know basis in order to provide the services we are engaged to provide.  Ensure that the recipient knows the information is confidential and has been instructed about restrictions on further use and dissemination.

(f)    Comment or provide information on matters related to the firm's business only if it is part of your job function or you are otherwise authorized to do so.

(g)    Protect confidential information when communicating electronically -- for instance, by e-mail or through the internet.

(h)    Remember that all forms of communication are covered, including written, telephonic, and electronic communications such as website chatrooms, e-mail, and instant messaging.

(i)    Consult your manager or your Compliance officer if you have any question about whether information can be shared.

*Related Links:*
Use of Confidential Information
Communication on Matters Related to the Company's Business
Information Technology Risk Management Policies
Social Security Numbers for Employees
Global Secure Shred Disposal Policy

### 3.2.    Prior employer's confidential information and trade secrets

Do not disclose to JPMorgan Chase, or use during your employment at JPMorgan Chase, any confidential information or trade secret of a prior employer, unless the information or trade secret is then public information through no action of your own.

### 3.3.    Special rules regarding customer information and data privacy legislation

Each of us has a special responsibility to protect the confidentiality of information related to customers. This responsibility may be imposed by law, may arise out of agreements with our customers, or may be based on policies or practices adopted by the firm. Certain jurisdictions have regulations relating specifically to the privacy of individuals and/or business and institutional customers. Various business units and geographic areas within JPMorgan Chase have internal policies regarding customer privacy. You should be familiar with those that apply to you. Customer information should never be disclosed to anyone outside the firm except as permitted by law and in the proper conduct of our business, where disclosure is required by legal process, or where the Legal and Compliance Department otherwise determines it is appropriate.

*Related Links:*
Use of Confidential Information
Communication on Matters Relating to the Company's Business
Global Secure Shred Disposal Policy

### 3.4.    Publications, speeches, and other communications relating to JPMorgan Chase's business

You should not comment on or provide information relating to JPMorgan Chase's businesses, or to any subject matter that relates to your job responsibilities or expertise at JPMorgan Chase, in public forums (including internet chatrooms, bulletin boards, blogs, etc.) unless you are specifically authorized to do so. The concept of "relating to JPMorgan Chase's businesses" is broadly defined and generally includes anything related to the financial services industry; the firm itself and its businesses; such matters as the firm's security, technology support, procurement practices, legal/regulatory/compliance issues, etc.; and the firm's customers, employees, or vendors.

You should also be alert to situations in which you may be perceived as representing or speaking for the firm. You should not make any statements on behalf of JPMorgan Chase unless you are authorized to do so. Refer all media inquiries to the Media Relations Office.

Public testimony (as an expert witness or otherwise), publications and speaking engagements relating to the firm's business are subject to pre-clearance. Subpoenas, requests from law enforcement or regulatory

authorities, media inquiries, product advisory boards, and requests from customers or suppliers for testimonials or endorsements should be handled in accordance with applicable procedures. Before engaging in any of these activities, consult your Compliance officer or your Code Specialist and the relevant policies and procedures. Procedures for pre-clearance of these activities are included in the policy on *Communication on Matters Relating to the Company's Business.*

If you will be paid for any of these activities, you will also need pre-clearance under Section 6.3.2 (outside activities); consult your Code Specialist.

*Related Links:*
Communication on Matters Relating to the Company's Business
Use of Confidential Information
Intellectual Property Policy

## 4.    INSIDE INFORMATION AND THE CHINESE WALL POLICY

Buying or selling securities while in possession of material non-public information is prohibited, as is the communication of that information to others.

### 4.1.    Inside Information

If you are aware of inside information,

(a)    you may not buy or sell securities (including equity securities, bonds and other debt securities, convertible securities, derivatives, options, any stock index including any such security as an element, and any other financial instruments) that may be affected by that information, either for your own account or any account over which you exercise control, alone or with others.

(b)    you may not pass along any inside information expressly or by way of making a recommendation for the purchase or sale of such securities based upon inside information.

"Inside information" is material, nonpublic information about the securities, activities, or financial condition of a corporation, public entity, or other issuer of securities. Material, nonpublic information concerning market developments may also be construed to be inside information.

Information is "material" if it could have an impact on the market price of securities involved or if it is likely that a reasonable investor would consider the information important in deciding whether to purchase or sell the securities. Information may be material to one issuer but not to another, or to certain securities of an issuer but not to all securities of that issuer.

Information should be considered "nonpublic" unless it is clearly public. Information is deemed public once it has been publicly announced or otherwise disseminated in a manner that makes the information available to investors generally.

Likewise, you may not buy or sell securities if you have knowledge of proposed customer trades, trades by JPMorgan Chase, or forthcoming research reports regarding those securities or the issuer of those securities, and you may not pass along this information to others in any way.

9

These prohibitions are applicable no matter how you acquired the inside information. They are applicable to the securities of JPMorgan Chase as well as to those of other companies.

These prohibitions do not apply to qualified transactions pursuant to certain planned acquisition or selling programs, such as so-called 10b5-1 programs. These prohibitions also do not apply to legally permissible transactions with the issuer of the securities, or with other persons having the same information you have (a circumstance likely to be relevant only in the context of private securities). Before engaging in any transactions you believe to be permissible under this paragraph, you must consult with your Compliance officer.

### 4.2.    The Chinese Wall policy and other information barriers

The firm's Chinese Wall policy refers to a system of information barriers designed to limit the flow of inside information from areas that routinely have access to such information, such as Investment Banking, Capital Markets, Commercial Lending, Credit, Restructuring, and Mergers and Acquisitions ("insider areas"), to those areas that trade in or sell securities or provide investment advice regarding securities, such as Sales, Trading, Research, and Asset Management ("public areas"). The Chinese Wall policy prohibits anyone in an insider area from communicating inside information, however obtained, to anyone in a public area, subject to limited exceptions approved by the relevant Compliance officer.

In addition, some business areas within the firm require procedures that address more specifically the information flows within those business areas. These are also sometimes referred to as Chinese Walls.

Employees subject to the firm's Chinese Wall policy, or to other information barriers designed to meet specific business needs, are responsible for compliance with the provisions of applicable policies.

*Related Link:*
Chinese Walls and Other Information Barriers

### 5.    OTHER BUSINESS CONDUCT

We are all expected to conduct the firm's business in accordance with the highest ethical standards, respecting the firm's customers, suppliers, and other business counterparties, dealing responsibly with the firm's assets, and complying with applicable legal and regulatory requirements.

### 5.1.    Assets of the firm

You are expected to protect the firm's assets as well as the assets of others that come into your custody.

The firm's assets include not only financial assets such as cash and securities and physical assets such as furnishings, equipment and supplies, but also customer relationships and intellectual property such as information about products, services, customers, systems and people. All property created, obtained, or compiled by or on behalf of the firm --- including customer lists, directories, files, reference materials and reports, computer software, data processing systems, computer programs, and databases --- belongs to the firm.

The firm's assets should be used only for the conduct of the firm's business, except where limited incidental personal use is authorized by the Code or other applicable policies.

## 5.2.    Intellectual property

Any invention, discovery, development, concept, idea, process, or work related to the firm's business, written or otherwise, whether or not it can be patented or copyrighted, that you develop alone or with others during your employment with the firm (all of which are referred to as "Company Inventions") belongs to the firm. If a Company Invention is something that can be copyrighted and you create it as a part of your job with the firm or because the firm asks you to create it, it is a "work made for hire." The firm is not required to acknowledge your role in the creation of any Company Inventions or to have your permission to modify, expand, or benefit from it.

As a condition of your employment, you assign exclusively to the firm all of your right, title and interest in Company Inventions. You further agree to assist the firm in obtaining for its own benefit intellectual property rights, including any patents and copyrights, in the Company Inventions and agree to deliver any documents that may be requested to assure, record or perfect your assignment of the Company Inventions to the firm.

*Related Links:*
Intellectual Property Policy
Report of Prior Inventions

## 5.3.    Telephones, e-mail, internet, and other electronic communications devices

Telephones, electronic mail (e-mail) systems and other electronic communications devices provided by JPMorgan Chase, whether in the workplace or elsewhere, are the property of the firm and should be used for business purposes; however, limited incidental personal use is permitted, consistent with the Code and all other policies of the firm.

The use of e-mail, the firm's intranet and the internet must conform to the policies of JPMorgan Chase. E-mail and internet systems may be used to transmit or provide access to confidential information only when such information is adequately protected and transmitting such information is necessary for business purposes.

Among other things, the following are prohibited in electronic communications:

    (a)    statements, which, if made in any other forum, would violate any of our policies, including policies against discrimination and harassment; participation in impermissible or illegal activities (such as gambling or the use and sale of controlled substances); and the misuse of confidential information.

    (b)    accessing, downloading, uploading, saving, or sending sexually oriented or other offensive materials.

JPMorgan Chase considers all data and communications transmitted through, received by, or contained in the firm's electronic or telephonic equipment and systems to be JPMorgan Chase's property.  Subject to applicable laws and regulations, JPMorgan Chase reserves the right to monitor, review, and disclose all such data and communications as it deems appropriate.  You should have no expectation of privacy when using such resources.

**5.9.     Bribery and the Foreign Corrupt Practices Act**

Federal and other laws in the United States and the laws of many other countries prohibit giving, offering, or promising, directly or indirectly, anything of value to corruptly influence any government official, including any officer of a political party or a candidate for political office, for the purpose of obtaining or retaining business or to secure an improper advantage (such as favorable regulatory or judicial action). Offering or paying such remuneration to any such person, either directly or through any intermediaries such as agents, attorneys or other consultants, is strictly prohibited.

In addition, you may not accept any such payments in connection with any business decision or transaction, even if such payments are customary in the particular country involved.

*Related Links:*
Travel and Entertainment Policies (U.S.)
Travel and Entertainment Policies (Latin America)
Travel and Entertainment Policies (EMEA)
Travel and Entertainment Policies (Asia)
Anti-Corruption Policy (Foreign Corrupt Practices)

**5.10.     International boycotts and economic sanctions**

The U.S. antiboycott law prohibits certain actions to comply with or support an unsanctioned foreign boycott against a country friendly to the United States. The prohibited actions include refusing to do business in a certain country, furnishing information about a person in response to a boycott-related request, and implementing a letter of credit that contains a condition related to any of the prohibited actions.

The U.S. economic sanctions regulations prohibit U.S. persons, including U.S. financial institutions and their foreign branches and non-U.S. affiliates, from exporting financial services to certain foreign governments and their specially designated nationals named by the Office of Foreign Assets Control (OFAC). These regulations also require that assets of these governments and persons be frozen. All JPMorgan Chase branches and subsidiaries are required to establish policies and procedures to ensure that their customers (and potential customers) are not on the OFAC list. You should be familiar with the policies and procedures that apply to you.

*Related Link:*
OFAC Sanctions Law Policy: United States

**5.11.     Post-employment responsibilities**

As a condition of continued employment with JPMorgan Chase, employees will have certain responsibilities after their employment with JPMorgan Chase terminates. These responsibilities include an obligation to return all firm assets in their possession, maintain the confidentiality of information, refrain from insider trading based on information obtained in the course of employment by JPMorgan Chase, and, if requested, assist JPMorgan Chase with investigations, litigation, and the protection of intellectual property relating to their employment. Senior-Level Employees have additional obligations for one year after they leave JPMorgan Chase, including prohibitions on the solicitation and hiring of JPMorgan Chase employees and solicitation of certain customers. Certain employees are subject to other

post-employment restrictions. You are responsible for knowing which post-employment restrictions and requirements apply to you.

*Related link:*
Responsibilities of Former Employees

### 5.12.    Other professional obligations of some employees

Some employees have additional obligations relating to their positions with the firm, including employees who are considered to be finance professionals, certain employees acting as attorneys for the firm, and certain officers in the Investment Bank. If you are subject to any of these additional requirements, you should be familiar with and comply with them.

*Related links:*
Code of Ethics for Finance Professionals
SEC Rule 205 Compliance Policy – Up the Ladder Reporting (for lawyers)
IB Americas Notice Period Policy
IB EMEA Notice Period Policy
IB Asia Notice Period Policy

## 6.    OUTSIDE ACTIVITIES, GIFTS, AND OTHER POTENTIAL CONFLICTS OF INTEREST

Employees must never permit their personal interests to conflict with or to appear to conflict with the interests of the firm. When faced with a situation involving a potential conflict, ask yourself whether public disclosure of the matter could embarrass JPMorgan Chase or you, or would lead an outside observer to believe a conflict exists, whether or not one actually does. You must disclose to the Office of the Secretary all potential conflicts of interest, including those in which you may have been placed inadvertently due to either business or personal relationships with customers, suppliers, business associates, or competitors of JPMorgan Chase, or with other JPMorgan Chase employees.

### 6.1.    Personal relationships

In general, you may not act on behalf of JPMorgan Chase in any transaction or business relationship involving yourself, members of your family, or other persons or organizations with which you or your family have any significant personal connection or financial interest. These matters should be handled by an authorized unrelated employee.

You may not engage in self-dealing or otherwise trade upon your position with JPMorgan Chase or accept or solicit any personal benefit from a client or supplier not generally available to other persons or made available to you due to your position with JPMorgan Chase (except in accordance with our policies regarding the occasional acceptance of gifts).

Negotiating with JPMorgan Chase on behalf of others with whom you or your family have a significant connection should be avoided if there is a risk that your involvement would be perceived as self-dealing or trading upon your position with the firm.

**Definitions and Examples**

**Assets of the Firm:** Examples of assets of the firm are:

- furnishings, equipment, supplies and services, such as telephone, the firm's intranet, internet, and Bloomberg access
- JPMorgan Chase inventions
- any property created, obtained, or compiled by or on behalf of JPMorgan Chase, including customer lists, directories, files, reference materials and reports, computer software, data processing systems, computer programs and databases
- trade secrets
- security and other business practices or processes, policies, procedures, and know-how
- cost, pricing, or financial information
- employee compensation, health, or personnel records
- business or marketing plans
- research
- business relationships
- products and services
- any other information that the firm considers to be proprietary or confidential information

**Chinese Wall:** The term "Chinese Wall" usually refers to the policies that create a system of information barriers designed to limit the flow of inside information from areas that routinely have access to such information to those areas that trade in or sell securities or provide investment advice regarding securities. Certain business areas within JPMorgan Chase require procedures that address more specifically the information flows within such business areas. These are sometimes also referred to as Chinese Walls.

**Code Specialist:** Each line of business and support group has been assigned at least one "Code Specialist," generally a Compliance officer, to act as a resource for all employees in the area on Code-related issues. Contact information for these officers is included in the Code Contacts List, and employees can contact their Code Specialist for assistance with any questions regarding the Code.

**Confidential information:** Examples of confidential information:

- trade secrets, security and other business practices or processes, policies, procedures, or know-how
- internal and external audit reports
- nonpublic portions of bank examination reports and other reports or information filed with regulators
- software, data processing programs, databases
- customer or supplier lists, telephone or other contact lists, and other information about customers
- customer presentations
- information about employees of customers or suppliers
- cost, pricing, or financial information
- employee directories, lists, telephone numbers, or other information about employees
- employee compensation, health, or personnel records
- business or marketing plans and research
- information posted on the firm's internal websites

Examples of other confidential information about customers:

- the same kind of information that the firm considers confidential about itself
- information obtained from requests or applications for our products or services or as a result of "know your customer" due diligence, such as a personal identification number (for example, depending on the location, a passport, social security, or national health number), birth date or financial information disclosed in a loan application
- information about transactions with the firm, such as account balances, mortgage loans, or other lending, capital markets, or trading transactions
- information obtained from consumer reporting agencies (credit bureaus), such as a person's credit history
- information provided in connection with an advisory assignment, such as financial projections
- any assessment by the firm of a customer's creditworthiness
- the fact that a person is a customer
- information collected through an information collection device from a web server (such as a cookie or a beacon)

Supplier or other third party information that you should assume to be confidential:

- the same kind of information that the firm considers confidential about itself
- information received from others such as financial reports or projections and information about its business plans, customers, suppliers, or creditors

**Firm:** JPMorgan Chase & Co. and its direct and indirect subsidiaries.

**Gift:** Anything of value for which you are not required to pay the retail or usual and customary cost. A gift may include meals or refreshments, goods, services, tickets to entertainment or sporting events, or the use of a residence, vacation home, or other accommodations.

**Inside information:** Confidential information that is material, nonpublic information about the securities, activities, or financial condition of a corporation, public entity, or other issuer of securities or financial instruments. Material, nonpublic information concerning market developments may also be construed to be inside information.

**JPMorgan Chase:** JPMorgan Chase & Co. and its direct and indirect subsidiaries.

**Material information:** Information is "material" when it could have an impact on the market price of securities involved or if it is likely that a reasonable investor would consider the information important in deciding whether to purchase or sell the securities. Information may be material to one security but not to another. Information may be material to certain securities of an issuer but not material to all securities of that issuer (e.g., to equity, but not to debt). Examples of information that could be material include:

- mergers, acquisitions, tender offers and restructurings
- substantial nonperforming loans or impending bankruptcy
- securities offerings and repurchases
- a change in earnings and dividends (or estimates of same)
- significant new business products, discoveries, and services, or the loss of any of these
- a change in an issuer's credit rating by a rating agency
- significant shifts in operating or financial circumstances, such as cash-flow reductions, major write-offs, changes in accounting methods and strikes at major plants
- voluntary calls of debt or preferred stock issues